IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

AMNAH QAISER,                        )
                                     )
     Plaintiff,                      )
                                     )
          v.                         )    Case No. 1:15-cv-1627
                                     )
SMALL BUSINESS ADMINISTRATION,       )
ET AL.,                              )
                                     )
     Defendants.                     )

## M E M O R A N D U M   O P I N I O N

      This matter is before the Court on Defendants' motion
to dismiss or for summary judgment in this Title VII employment
discrimination and hostile work environment case.  [Dkt. 14.]
For the following reasons, the Court will grant the motion for
summary judgment.

### I.        Background

      Plaintiff Amnah Qaiser ("Qaiser") is a Muslim, is
Pakistani, and has brown skin.  (Compl. [Dkt. 2] ¶ 13.)  From
2006 through September 2012 she provided loan servicing
assistance as a contractor for the United States Small Business
Administration's ("SBA") National Guaranty Purchase Center
("Center") in Herndon, Virginia.  (Id. ¶ 20.)  Qaiser brings
this lawsuit alleging that Center Director Vanessa Piccioni
("Piccioni") and "her underlings" discriminated against Qaiser

1

based on race, color, national origin, and religion during the time she provided contract services for the Center. (*Id.* ¶ 20.) Those allegations focus on two incidents in 2010 and one incident in 2012.

The first allegedly discriminatory incident occurred in April 2010. At that time, Qaiser had worked in various loan servicing assistance roles at the Center for several years as a contract employee for a company holding a contract with the SBA, Washington Products Services ("WPS"). (*Id.* ¶ 3.) In March 2010, Qaiser applied and interviewed for a promotion to a loan specialist position with WPS. (*Id.* ¶ 4.) On April 1, Qaiser received a congratulatory email from WPS offering her the promotion and instructing her to sign and return an acceptance letter that day. (Compl. Ex. A [Dkt. 2-7].) Two hours later, and before Qaiser submitted her acceptance, a WPS officer emailed Qaiser withdrawing the offer. (Compl. Ex. B [Dkt. 2-7].) The email explained that the SBA liaison called WPS and said the "SBA has decided that the Loan Specialist position will not be filled at this time." (*Id.*) Less than two weeks later, however, WPS allegedly offered the position to someone who is not Muslim or Pakistani and who had less experience working at the Center than Qaiser. (Compl. ¶ 12; Afari Decl. [Dkt. 20-4] ¶ 7.)

Qaiser alleges that WPS withdrew the promotion offer because Piccioni "interfered, and with intimidation and threat to WPS demanded that they retract the offer they made to [her]." (Compl. ¶¶ 4, 21; Afari Decl. ¶ 6.)  According to the complaint, Piccioni "hated [Qaiser] for some unexplained reason, and not because she was not qualified for the position or any justifiable business reasons."  (Compl. ¶ 4.)  No SBA employee ever told Qaiser that Piccioni hated her or that Piccioni's alleged hatred motivated WPS's decision to withdraw the offer. (Compl. ¶ 21.)  After this withdrawn promotion, Qaiser continued working as a loan servicing assistant contractor for WPS at the Center in Herndon.  (Compl. ¶¶ 11-12.)

The second alleged act of discrimination occurred in May 2010.  (Compl. ¶ 27.)  Around this time, Qaiser had ordered some vitamins and diet pills to be delivered to the Center. (Compl. ¶ 5; Compl. Ex. G [Dkt. 2-12]; Qaiser Depo. [Dkt. 15-4] at 42.)  On a Friday, Qaiser was searching around the Center for the package when she came across a work friend, who invited Qaiser to walk to a supermarket next door.  (Compl. Ex. G; Qaiser Depo. at 42-43.)  While on this break, Qaiser complained to her friend about her package delivery woes.  (Compl. Ex. G; Qaiser Depo. at 44.)  Qaiser grumbled that, in addition to mishandling the diet-pills package, the postal service once

wrongly delivered a package to the Center, when the package should have gone to the Inspector General's Office. (Compl. Ex. G; Qaiser Depo. at 44.) Qaiser, who was working in the Center mailroom at the time, unknowingly opened the Inspector General's package and found a firearm inside. (Compl. Ex. G; Qaiser Depo. at 44.) Qaiser explained that she took the package and firearm to the Inspector General's Office where an employee instructed her not to open the Inspector General's packages. (Compl. Ex. G; Qaiser Depo. at 45.)

As Qaiser described this incident, her friend became confused. (Compl. Ex. G; Qaiser Depo. at 46.) Misunderstanding Qaiser's story, the friend came to believe that the firearm incident had occurred that same day and the friend grew concerned about a gun being at the workplace. (Compl. Ex. G; Qaiser Depo. at 46.) Before going home for the weekend, the friend relayed her concern to Piccioni by reporting that Qaiser found a firearm at the Center and gave it to the Inspector General. (Compl. Ex. G; Qaiser Depo. at 46.) Piccioni also became concerned and contacted the Inspector General's Office to verify its receipt of the firearm. (Compl. Ex. G.) When the Inspector General's Office reported that it had not received any firearm recently from Qaiser, Piccioni called WPS to get Qaiser's cellphone number to investigate this incident. (Compl.

Ex. G.)  After receiving no answer from Qaiser, Piccioni sent an email instructing Center employees not to come to the office over the weekend.  (Compl. Ex. G.)  Piccioni then emailed WPS and asked that they contact Qaiser immediately to investigate this issue.  (Compl. Ex. G.)  About thirty minutes later, Piccioni was able to reach Qaiser by cellphone, but Qaiser said she had no idea what firearm Piccioni was talking about. (Compl. Ex. G.)  Piccioni instructed Qaiser to report to work early on Monday to meet with an Inspector General agent and told Qaiser she would have no access to the Center until that interview.  (Compl. Ex. G.)

On Monday morning around 7:00 a.m., an Inspector General agent and Piccioni interviewed Qaiser and the friend about the firearm.  (Compl. Ex. G.)  From those interviews, Piccioni learned that the whole incident was the result of the friend misunderstanding Qaiser's story. (Compl. Ex. G.) Piccioni explained in an email to WPS officers, SBA administrators, Inspector General agents, and Qaiser, that the whole episode was "a situation of a major miscommunication." (*Id.*)  Qaiser returned to work that same morning.  (*Id.*)

The third incident occurred in September 2012, when Qaiser was not hired for a permanent SBA job opening at the Center.  In April 2012, Piccioni informed the Center's contract

employees that several permanent loan servicing assistant positions had just been made publicly available.  (Pl.'s Ex. 8 [Dkt. 20-9]; Compl. ¶ 6.)  Qaiser applied and learned in June 2012 that the SBA staffing office in Denver deemed her "qualified" and referred her name "to the selecting official(s) for consideration."  (Pl.'s Ex. 9 [Dkt. 20-10].)  A three-person panel then interviewed Qaiser and twenty-one other qualified applicants for the position.  (Hardy Decl. [Dkt. 15-7] ¶ 5.) The SBA ultimately hired ten applicants, but Qaiser was not one of them.  (Hardy Decl. attach. 1.)

The interview panel included the following three senior Center employees:  Assistant Director for Center Operations Kevin Hardy ("Hardy"), an African-American (Qaiser Depo. at 3; Hardy Decl.); Supervisory Loan Specialist for the Loan Accounting Division Angelia Hicks ("Hicks"), an African-American and a Christian (Qaiser Depo. at 3; Hicks Decl. [Dkt. 15-9]; Pl.'s Ex. 13 [Dkt. 20-15] at 7); and Supervisory Loan Specialist in the Care and Preservation Costs Department Cynthia Smith ("Smith"), who is white and a Catholic (Qaiser Depo. at 3; Smith Decl. [Dkt. 15-10]; Pl.'s Ex. 13 at 6).  The interviewers asked the candidates two questions about work-related experience, two questions about displays of initiative, and two questions about character.  (Hardy Decl. ¶ 5; Hardy Decl.

6

attach. 1.)  The interviewers independently assigned the candidates scores of 0 to 5 for each question and weighted the total scores to create a scaled candidate score from 0 to 10, with 10 being the highest.  (Hardy Decl. attach. 1.)

Qaiser did not receive good scores from her interview. Although Qaiser testified that her interview "went great" because she got feedback of "good facial expressions," the interviewers testified otherwise.  (Qaiser Depo. at 4.)  Hardy said that "Qaiser's responses demonstrated that she seemed confused about how to prioritize her work," that she "talked around" a question rather than answering it directly, that she "didn't seem to understand" another question, and that her answer regarding a professional or personal challenge "did not add up."  (Hardy Decl. ¶ 7.)  He gave her a total score of 5.25 out of 10.  (Hardy Decl. attach. 1.)

Hicks said Qaiser had a "very subtle and kind disposition" and that she answered a question related to teamwork well, but that "there were some things on her resume that she could not expound on, she did not express herself very well, and she did not really answer one of the questions." (Hicks Decl. ¶ 7.)  Overall, Hicks said that Qaiser's "responses were not extraordinary responses that displayed extensive

knowledge and skills." (*Id.*)  Hicks gave her a score of 6.44 out of 10.  (Hicks Decl. attach. 1.)

Smith said that "[b]ased on the interviews, I did not believe that Ms. Qaiser was one of the best candidates for the position." (Smith Decl. ¶ 6.)  Smith also noted that the interviewers were "looking for mortgage professionals, people who had experience in the mortgage services industry," but Qaiser "did not demonstrate that experience well in her interview." (*Id.*)  Smith gave Qaiser a score of 6.25 out of 10. (Smith Decl. attach. 1.)

Averaging the three scores together, Qaiser received a rating of 5.98 out of 10.  (Hardy Decl. attach. 2.)  This ranked her twentieth out of the twenty-two candidates interviewed. (*Id.*)  These rankings were then given to Piccioni, who extended offers to the top ten candidates.  (Piccioni Decl. [Dkt. 15-8] ¶ 6.)  Because some of the top candidates declined the offer and others did not pass security clearance, Piccioni ultimately extended offers to the top seventeen individuals before all ten positions were filled.  (*Id.*)  Among those hired were six African Americans, one Caucasian, one Indian, one Asian, and one Egyptian.  (*Id.* ¶ 8.)  Qaiser ranked twentieth on the list and thus was not selected.  (*Id.* ¶ 7.)  All three interviewers testified that race, color, national origin, and religion did

8

not factor into their evaluations.  (Hardy Decl. ¶ 7; Hicks

Decl. ¶ 6; Smith Decl. ¶ 7.)

Qaiser appears to allege that Piccioni influenced the

interviewers' evaluation of Qaiser in some way, although that

accusation is far from clear.  The complaint alleges that

Piccioni discriminated against Qaiser as follows:

> when she was passed for selection,
> apparently because she was not experienced,
> and yet, being asked to train and she did,
> new hires who used the skills she imparted
> to them, to earn more money and enjoy all
> the benefits of being a United States
> permanent employer, when she could not just
> because she was a Pakistani and a Muslim and
> Vanessa Picciono did not like her, even
> though she knew she was a good worker and
> used her like a slave.

(Compl. ¶ 29 (all errors in original).)  In assorted paragraphs

in the complaint, Qaiser makes several allegations that she

believes demonstrate Piccioni interfered with the panel's

evaluation, including the following: some time after the

interviews, Hardy asked Qaiser to help train three of the hired

candidates and told her "good job"; Qaiser had over four years'

experience working as a loan servicing assistant contractor; a

supervisor wrote her a favorable recommendation letter; and

Piccioni "reserve[d] slots" for other candidates.  (Compl. ¶¶ 4,

6, 11, 12, 13, 23, 24, 25, 26, 29.)  The substantiation behind

9

those allegations and Defendants' responses are discussed more fully in the pretext analysis below.

After not receiving the permanent job offer, Smith's contract was nearing its natural end around September 28, 2012. (Compl. ¶ 3.)  On September 21, she contacted an Equal Employment Opportunity Counselor ("EEO Counselor") regarding the two incidents in 2010 and the recent hiring decision.  (*See* EEO Report [Dkt. 15-3].)  After listening to Qaiser, the EEO Counselor interviewed the three panelists and reviewed several documents related to Qaiser's allegations.  On October 16, 2012, the EEO Counselor issued a notice of right to file a formal complaint, which Qaiser did on November 1, 2012.  (EEO Compl. [Dkt. 15-1]; EEO Report.)  On November 30, 2012, the EEO Director for the SBA sent Qaiser a notice that she would investigate the allegations related to the 2012 interview, but that the two 2010 incidents were dismissed as untimely.  (EEO Notice [Dkt. 15-6].)  Thereafter, an EEO contractor investigated the decision not to hire Qaiser in 2012, resulting in a 681-page report.  (Defs.' Ex. M [Dkt. 15-13].)  After receiving the report, Qaiser requested a hearing before an Administrative Law Judge ("ALJ").  (ALJ Mem. Op. [Dkt. 15-14].)  Initially Qaiser proceeded *pro se*, but she retained counsel near the end of discovery for this administrative hearing.  (Pl.'s Ex. 12 [Dkt.

10

20-14].)  Ultimately, however, the ALJ granted summary judgment as to the 2012 claim without conducting a formal hearing.  (ALJ Mem. Op. at 7.)

On June 29, 2015, Qaiser filed a corrected complaint with the United States District Court for the District of Columbia alleging three causes of action related to the incidents discussed above: (1) unlawful discrimination under Title VII; (2) discriminatory harassment; and (3) hostile work environment.  Qaiser named the SBA, SBA Administrator Maria Contreras-Sweed, and Piccioni as defendants (collectively "Defendants").  After the case was transferred here, Defendants motioned to dismiss or for summary judgment.  After full briefing and oral argument, this motion is ripe for disposition.

## II.        Standard of Review

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss allegations that fail "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A Rule 12(b)(6) motion tests the legal sufficiency of the complaint. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  A court reviewing a complaint on a Rule 12(b)(6) motion must accept well-pleaded allegations as true and must construe factual allegations in favor of the plaintiff.  *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994).

11

If the court considers matters outside of the pleadings on a Rule 12(b)(6) motion, it shall treat the motion as one for summary judgment, to be disposed of under Rule 56, and provide all parties a "reasonable opportunity to present all material made pertinent to such a motion." Fed. R. Civ. P. 12(d). "When a party is aware that material outside the pleadings is before the court, the party is on notice that a Rule 12(b)(6) motion may be treated as a motion for summary judgment." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985).

Generally, "summary judgment must be refused when the nonmoving party has not had the opportunity to discover information that is essential to his opposition." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986). When a party has not had that opportunity, she should follow Federal Rule of Civil Procedure 56(d) by setting "out the reasons for discovery in an affidavit, and [she] cannot withstand a motion for summary judgment merely by asserting in [her] brief that discovery was necessary." *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Strict compliance with Rule 56(d) "may not be necessary where the circumstances are such that the nonmoving party, through no fault of its own, has had little or no opportunity to conduct discovery, and when fact-intensive issues, such as intent, are involved, provided that the nonmoving party has adequately

12

informed the district court that the motion is pre-mature and that more discovery is necessary." *Id.* (quoting *Harrods Ltd v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002)).

In this proceeding, the Court relies upon matters outside of the pleadings and will thus consider this motion as one for summary judgment. Qaiser had sufficient notice that the summary judgment standards would apply because both parties titled their motions as pertaining to summary judgment and both parties presented matters from outside of the pleadings, including affidavits. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

Furthermore, additional opportunity for discovery is not necessary. When a case comes before the Court with an extensive administrative record, that record "at the very least" should enable the plaintiff to produce an affidavit sufficiently detailed to meet the requirements of Rule 56(d) demonstrating the need for more discovery. *Radi v. Sebelius*, 434 F. App'x 177, 179 (4th Cir. 2011). This case comes before the Court with a robust administrative record, including a 681-page report of the administrative investigation containing depositions from all the relevant parties, emails related to the 2010 firearm incident, the resumes of every candidate hired for the 2012 loan servicing assistant position, and the interviewers' ranking

13

sheets and notes for every candidate interviewed for the 2012 position.  Additionally, Defendants produced recent declarations from Hardy, Smith, Hicks, Piccioni, and an SBA human resources specialist.  Similarly, Qaiser produced declarations from herself, her supervisor at WPS, and a coworker.

In light of the record in this case, Qaiser's stated need for additional discovery is insufficient.  Qaiser submitted a declaration requesting discovery to depose Hardy, Smith, Hicks, Piccioni, and the SBA human resources specialist.  (Smith Decl. ¶ 10 [Dkt. 20-1].)  Instead of describing any specific fact these depositions might reveal, she hopes more depositions will allow her to dispute the "veracity" of the deponents' former sworn testimony.  (Pl.'s Mem. in Opp'n at 9-10.)  She does not identify any reason to believe the deponents would produce new testimony not contained in the depositions or declarations.  In essence, this motion is "founded on the purely speculative hope that the ranking panel members will recant their sworn testimony and reveal a long-running and intricately planned conspiracy to keep Plaintiff from advancing . . . up the government service ladder."  *Hamilton v. Geithner*, No. 1:08-cv-1112 (JCC), 2009 WL 2240358, at *2 (E.D. Va. July 23, 2009).  Such a request does not justify additional discovery in this case, especially as "the questions that [she] wants to ask were

14

substantially answered under oath and closer in time to the occurrence of the events in question." *Id.*; *Boyd v. Guiterrez*, 214 F. App'x 322, 323 (4th Cir. 2007) (affirming denial of request for more discovery because "numerous documents and affidavits submitted during his EEOC proceedings were already available"). Accordingly, the Court will deny the request for additional discovery and will treat this motion as one for summary judgment.

Summary judgment is appropriate only if the record shows that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson*, 477 U.S. at 247-48. The party seeking summary judgment has the initial burden of showing the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party must come forward and show that a genuine dispute exists. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The party opposing summary judgment may not rest upon mere

15

allegations, denials, or speculation.  *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986).  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. In reviewing the record on summary judgment, the court "must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

### III.    Analysis

For the reasons described below, the Court will grant the motion for summary judgment with respect to all causes of action.  First, Qaiser failed to timely exhaust her administrative remedies regarding the claims of discrete discriminatory acts in April 2010 and May 2010.  Second, Qaiser failed to prove that Defendants' legitimate, nondiscriminatory reason for not hiring her in September 2012 was pretext for unlawful discrimination.  Third, Qaiser did not show that Defendants created a severely hostile work environment through the use of discriminatory conduct based on Qaiser's protected statuses.  Fourth, Qaiser's harassment claim is indistinguishable from her hostile work environment claim and is

16

similarly inadequate.  Fifth, in the alternative to the
foregoing, only the SBA Administrator is a proper defendant in
this Title VII case.  The Court explains each of these bases for
summary judgment in more detail below.

A.        Administrative Exhaustion

        Defendants contend that Qaiser did not
administratively exhaust her discrimination claims relating to
discrete employment actions in April and May 2010.  (Defs.' Mem.
in Supp. at 11.)  The Court agrees and will grant Defendants
summary judgment on those discrete claims.

        A federal employee seeking to file an action based on
Title VII must first exhaust her administrative remedies.  *See*
42 U.S.C. § 2000e-16; 29 C.F.R. § 1614.103(a).  Most relevant to
this case, federal employees who believe they have been
discriminated against must consult an EEO Counselor within 45
days of the "matter alleged to be discriminatory or, in the case
of a personnel action, within 45 days of the effective date of
the action," prior to filing a complaint to informally resolve
the matter.  29 C.F.R. § 1614.105(a).

        In this case, it is undisputed that Qaiser did not
timely consult an EEO Counselor after the April or May 2010
incidents.  Qaiser did not initiate contact with an EEO
Counselor until September 21, 2012, well over 45-day after April

17

or May 2010.  (EEO Report at 2.)  For that reason, the SBA dismissed the April and May 2010 claims before the EEO investigated her allegations and the ALJ never considered those claims.  (*See* EEO Notice at 3; ALJ Mem. Op.)  Accordingly, Qaiser did not exhaust those discrete claims.

Qaiser argues that the 45-day requirement should not apply here because she did not have notice of that requirement in 2012 and because the SBA engaged in affirmative misconduct that caused her to miss the deadline.  Qaiser is correct that a federal employee may defeat the affirmative defense of administrative exhaustion by proving by a preponderance of the evidence that she "was not notified of the time limits and was not otherwise aware of them," 29 C.F.R. § 1614.105(a)(2), or by proving that her employer engaged in affirmative misconduct justifying equitable tolling, waiver, or estoppel, 29 C.F.R. § 1614.604; *Zografov v. V.A. Med. Ctr.*, 779 F.2d 967, 969 (4th Cir. 1985).  A Title VII plaintiff, however, may not assert those doctrines for the first time in federal court.  As noted in a similar case in this district, "[w]here a plaintiff does not affirmatively raise the issue that he lacked notice and should be entitled to an extension during the administrative process, he has waived that notice argument in an appeal in federal court."  *Doe v. Brennan*, 980 F. Supp. 2d 730, 736 (E.D.

Va. 2013); *Cooley v. Goss*, 430 F. Supp. 2d 544, 550 (E.D. Va. 2005).  In other words, "[t]here is no indication in the statute that *courts* must allow extensions where the request was not first made to the agency."  *Doe*, 980 F. Supp. 2d at 736 (emphasis in original).

Qaiser failed to preserve her lack-of-notice and affirmative misconduct arguments during the administrative process.  When Qaiser filed her formal EEO complaint after meeting with an EEO Counselor, she did not mention either of her current explanations as the cause of her delay.  (EEO Compl.) Instead, she wrote the following:  "There have been far too many violations of fair employment laws which I have experienced during my tenure gone unnoticed due to the fact of myself not coming forward with this information sooner, as I had been waiting in good faith an opportunity would surely come my way." (EEO Compl.; EEO Notice (errors in original).)  After reading that explanation, the SBA EEO Director dismissed the April and May 2010 allegations as untimely.  (Defs.' Ex. F at 5.)  The EEO Director's notice informed Qaiser that she could challenge the dismissal ruling before the ALJ if she pursued a hearing.  (*Id.*) Qaiser requested a hearing, but did not preserve her objection to the dismissal of the April and May 2010 allegations.  Prior to discovery, the ALJ notified Qaiser that she must seek to

reinstate the dismissed claims if she wanted the ALJ to consider them.  (Defs.' Ex. X at 2.)  Almost two years after the 2012 hiring decision, on July 16, 2014, Qaiser's counsel raised a lack-of-notice argument for the first time in a memorandum opposing summary judgment before the ALJ and requesting a hearing.  (Pl.'s Ex. 11 at 2.)  Qaiser's counsel, however, did not move to reinstate the April and May 2010 claims.  (ALJ Mem. Op. at 1 ("The Complainant did not seek to reinstate the claims dismissed.").)  Accordingly, the ALJ never considered those claims or her arguments for untimely contact with an EEO Counselor.  (*Id.*)  Therefore, the Court will not entertain those explanations for Qaiser's failure to exhaust and will grant Defendants summary judgment on the discrete April and May 2010 causes of action.

Qaiser also argues that the 45-day requirement should not bar the Court from considering her April and May 2010 allegations as part of a continuous course of discriminatory conduct.  (Pl.'s Mem. in Opp'n at 18.); *see also Wilkinson v. Rumsfeld*, 100 F. App'x 155, 159 (4th Cir. 2004) (reversing district court's exhaustion finding because "[t]here is evidence that . . . shunning incidents were components of one hostile environment that occurred within the 45-day period to when Wilkinson sought EEO Counseling").)  Defendants, however, do not

raise the affirmative defense of exhaustion as to the hostile work environment claim.  Thus, the Court will not raise this affirmative defense *sua sponte* here and will consider the 2010 allegations within the context of Qaiser's hostile work environment claim.

The Court turns now to the only claim of discrete discriminatory conduct that Qaiser properly exhausted.

B.      Failure to Hire

Qaiser contends that Defendants discriminated against her on the basis of race, color, national origin, and religion when they did not hire her as a permanent loan servicing assistant in 2012.  (Compl. ¶ 29.)  Defendants recognize that a *prima facie* case of unlawful discrimination likely exists, but argue that they had a legitimate, nondiscriminatory reason not to hire Qaiser.  The Court agrees with Defendants and will grant summary judgment as to this claim.

Title VII makes it unlawful for an employer to discriminate against an individual because of that individual's race, color, religion, sex, or national origin.  *See* 42 U.S.C. § 2000e-(a)(1).  Instead of attempting to present direct or indirect evidence of such discrimination, Qaiser's memorandum in opposition to summary judgment proceeds under the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973).  Accordingly, the Court will consider her claim under that framework.

Under *McDonnell Douglas* and its progeny, the plaintiff first must make out a prima facie case of discrimination.  *See id.* at 802.  In cases of failure to hire, like this one, the *prima facie* case requires proof that the plaintiff (1) was a member of a protected class; (2) applied for the position in question; (3) was qualified for the position; and (4) was rejected for the position under circumstances giving rise to an inference of unlawful discrimination.  *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007); *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 189 (4th Cir. 2004).  For the purposes of this motion, the Court assumes Qaiser can satisfy this *prima facie* showing.

The burden then shifts to Defendants to provide a legitimate, non-discriminatory justification for not hiring Qaiser.  *See Hux v. City of Newport News, Va.*, 451 F.3d 311, 314 (4th Cir. 2006).  Defendants meet this burden by providing evidence that Piccioni decided not to hire Qaiser because the three interviewers ranked her twentieth out of the twenty-two applicants interviewed.  (*See* Defs.' Ex. H attach. 1.)  Qaiser received an average score from the panel of 5.98, whereas the

highest score was 9.42 and the lowest score of a person hired was 6.92.  (*Id.*)

As a result, the burden shifts back to Qaiser to show that the proffered explanation is pretext for intentional discrimination.  *Hux*, 451 F.3d at 315 (citing *Reeves*, 530 U.S. at 142-43.)  A plaintiff alleging a failure to hire may prove pretext by showing that she "was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons."  *Id.* (internal quotation omitted).  A plaintiff seeking to rebut an employer's hiring decision based on her qualifications, however, "cannot simply compare herself to other employees on the basis of a single evaluative factor artificially severed from the employer's focus on multiple factors in combination."  *Id.* (citing *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 271 (4th Cir. 2005)).  This principle follows from the summary judgment standards requiring "genuine" disputes relating to "material" facts and the practical reality that courts "are not cloaked with the authority to strip employers of their basic business responsibilities."  *Id.*

Applying those standards, Qaiser fails to demonstrate that her low ranking in the panel's assessment was pretext for discrimination.  The general thrust of Qaiser's pretext argument

is that she was qualified for the job, but did not receive it. (*See, e.g.*, Pl.'s Mem. in Opp'n at 22 ("Defendants [sic] claim that Plaintiff was not qualified is false and a pretext . . . .").)  This argument, however, misconstrues the legal standard for proving pretext.  A plaintiff's qualifications are material only when compared to the qualifications of the people ultimately hired.  For example, in *Moore v. Mukasey*, the Fourth Circuit concluded that the Title VII plaintiff in that case could "not rely on his qualifications to establish pretext because he [had] not presented evidence that would allow a reasonable jury to conclude that he was better qualified" than the individual hired.  305 F. App'x 111, 116 (4th Cir. 2008).  Thus, Qaiser's argument that she was generally qualified does not help her defeat summary judgment.

Furthermore, Defendants did not base their hiring decision on Qaiser being unqualified.  Defendants consistently stated that they did not hire Qaiser because she was not among the best of the qualified candidates, i.e. she was not *as qualified* as those individuals hired.  (*See, e.g.*, Smith Depo. [Dkt. 24-4] at 6 ("She was not as qualified as the candidates that we selected.").)  Among the twenty-two candidates that the Denver SBA Office deemed to be qualified, there were jobs available for only ten.  Qaiser was not the first among those

24

candidates, or the second, third, fourth, or fifth.  She was the
twentieth.  In other words, her qualification earned her the
opportunity to be interviewed, but did not ensure her selection
for the job.

Qaiser does not present any evidence or persuasive
argument that she is better qualified than any of those ten
individuals hired.  Qaiser's argument on this point, to the
extent she makes any, rests on the fact that she worked at the
Center longer than any of the ten hires.  It is an established
principal, however, that a discrimination plaintiff "cannot
simply compare herself to other employees on the basis of a
single evaluative factor artificially severed from the
employer's focus on multiple factors in combination."  *Hux*, 451
F.3d at 315.  Work-related experience was one of three broad
metrics the panel considered and was based on a determination of
skills acquired through experience, not simply time on the job.
(*See, e.g.*, Smith Depo. at 8 ("She may have been here at the
Center, but I don't believe she had any type of mortgage-related
experience . . . ."); *see also* Hardy Decl. attach 1 (listing
factors considered).)  Qaiser's argument amounts to a plea that
the panel should have given more weight to her seniority.
However, it is certainly "not within our authority to dictate

25

factors that employers must weigh when making a promotion."
*Hux*, 451 F.3d at 318.

Qaiser makes no argument that she was as qualified as
the hired candidates based on the panoply of factors the
interviewers considered, let alone that she was better
qualified. *See Moore*, 305 F. App'x at 116 ("[A] Title VII
plaintiff cannot rely on his qualifications to establish pretext
if he asserts that his qualifications are similar or only
slightly superior to those of the person ultimately selected for
promotion."). She does not attempt to confront the fact that
seven of the ten hires have college degrees, two have extensive
college training, and the remaining hire worked as a loan
servicing assistant contractor at the Center for two years and
worked at a bank for two years. (Defs.' Ex. P.) Qaiser, by
contrast, has a high school degree and over four years'
experience as a loan servicing assistant contractor at the
Center. (Defs.' Ex. Q.) She also does not engage the fact that
the interviewers prioritized the extensive mortgage experience
of many candidates, whereas she was unexperienced with
mortgages. (Smith Depo. at 6 ("We were looking for mortgage
professionals, people who had experience in the mortgage service
industry, either through loan servicing or loan processing or
loan origination. . . . And she did not have any of that

experience . . . .").) She also does not attempt to compare the
resumes of the hired candidates with her own, which had
prominently misspelled words and does not demonstrate any
professional lending experience outside of her role at the
Center. Furthermore, she does not persuasively dispute Hardy
and Hicks' assessments that her interview performance did not
make her a standout. (*See* Hardy Depo. [Dkt. 24-6] at 8; Hicks
Depo. [Dkt 24-5] at 17 ("Her answers to the specific questions
were basic ones.").) In sum, Qaiser does not identify one hire
who is less qualified than her based on the factors the
interviewers considered. Accordingly, Qaiser has not
demonstrated prejudice by arguing that she was better qualified
than the hires.

    Qaiser's several attempts to undermine the credibility
of the interviewers through circumstantial evidence are also
insufficient to defeat summary judgment. First, Qaiser attempts
to prove that she was qualified by noting that her former
supervisor, Debbie Lester, wrote Qaiser a favorable
recommendation after Qaiser did not receive the permanent job
offer. (Pl.'s Mem. in Opp'n at 21-23; Pl.'s Ex. 5.) This
letter, however, is merely another attempt to prove the
immaterial point of Qaiser's baseline qualification for the
position. The letter does not demonstrate pretext by showing

Qaiser's qualifications relative to the selected applicants.
Indeed, Lester could not make such a comparison because she was
not involved in the hiring process and never spoke to Piccioni
about the new hires.  (Defs.' Ex. L at 4.)  Furthermore, Lester
later testified that Qaiser was not "necessarily" someone who
should receive a permanent job at the Center.  Lester explained
that during Qaiser's employ the SBA had to move Qaiser to
different departments "primarily because she wasn't doing a
great job" and that she did not receive a permanent offer
because of "the mistakes that she made, she wasn't as efficient,
her production, her overall production was lower than her peers,
and I guess she just didn't leave an impression that that was
somebody that if given the opportunity to keep, that we
necessarily wanted to keep."  (*Id.*)  Thus, Lester's
recommendation letter does not demonstrate Qaiser's
qualification relative to the selected candidates or otherwise
demonstrate any pretext within the panel's assessment.

Second, Qaiser argues that pretext extends from the
fact that one of the panel interviewers later asked her to train
one of the newly hired employees and to quality check three of
the other new hires during their training periods.  (Pl.'s Mem.
in Opp'n 23.)  Qaiser argues that this demonstrates pretext
because it is inconsistent with the panel's assessment that she

28

was "unqualified" for permanent employment.  (*Id.*)  Qaiser
again, however, misunderstands that Defendants never found her
unqualified.  Instead, they found her not among the ten most
qualified for the job.  Thus, this fact cannot create a genuine
issue of material fact as to pretext.

Third, Qaiser argues pretext is evidenced by Hardy
giving her a low character rating, but later testifying that
Qaiser "has a pleasant personality and she was well liked
throughout the Center."  (Pl.'s Mem. in Opp'n at 24; Hardy Depo.
at 12.)  This perceived inconsistency does not create a genuine
issue as to pretext because the panel's assessment of character
was not based on niceness or likeability.  The panel's character
questioning related to the interviewee's impression of the
importance of teamwork and the interviewee's ability to describe
a time when she overcame a personal challenge.  (*See* Hardy Decl.
attach 1.)  Hardy rated Qaiser a 5 out of 10 in the character
assessment because Qaiser's answer to one character question
"did not add up" and her answer to the second indicated she
"didn't seem to understand the question."  (Hardy Decl. ¶ 7.)
Similarly, Hicks found that Qaiser did not "express herself
well" and "she did not really answer one of the questions."
(Hicks Decl. ¶ 7.)  Hardy's comment that Qaiser is pleasant and

29

likeable does not create a genuine dispute as to the legitimacy
of his character assessment.

Fourth, Qaiser argues that the panel asked the
interviewees different questions.  (Pl.'s Mem. in Opp'n at 24.)
Qaiser fails to articulate how this fact would prove that the
interviewers' evaluations were pretext for unlawful
discrimination.  None-the-less, there is no evidence showing
Qaiser received different questions than the selected
applicants.  The record contains the scoresheets from every
interview, which demonstrate that each applicant received the
same questions and was evaluated based on the same criteria.
(Defs.' Ex. Y.)  Furthermore, all three interviewers stated that
every applicant received the same questions.  (Hardy Decl. ¶ 5;
Hicks Decl. ¶ 6; Smith Decl. ¶ 5.)  An email Smith sent to Hicks
and Hardy before the interviews began does not indicate
otherwise.  (Pl.'s Ex. 16.)  In that email, Smith listed twenty
possible questions to ask the applicants.  (*Id.*)  Smith stated
in her declaration that the panel used these possible questions
to identify six questions that were then asked to each
applicant.  (Supp. Smith Decl. [Dkt. 24-12] ¶¶ 4-5.)  Qaiser
presents no evidence to refute this characterization of the
email or other indication that any applicant received different
questions than her.  Accordingly, this argument does not

30

demonstrate pretext of the panel's decision that Qaiser was not as qualified as the ten people hired.

Last, Qaiser argues that two women—Jennifer Sherrill and Candace Boyd—were hired despite not meeting the one-year eligibility requirement.  (Pl.'s Mem. in Opp'n at 20-21.)  Even if this fact were probative of pretext, Qaiser has not presented any affirmative evidence that it is true.  There is, however, substantial evidence that these individuals were not hired for the loan servicing assistant position that Qaiser applied for. The list of interviewees that received offers and were hired does not include either Sherrill or Boyd.  (*See* Hardy Decl. attach. 1.)  Furthermore, a Lead Human Resources Specialist from the SBA's Workforce Acquisition Division in Denver testified from her review of the SBA's documents related to the job posting that neither Sherrill nor Boyd applied for or was hired for the position that Qaiser applied for.  (Salazar Decl. [Dkt. 15-11] ¶¶ 5-6.)  Instead, both women applied for and received offers of employment for a later job posting that was different from the one Qaiser applied for.  (*Id.* ¶¶ 5-6.)  Accordingly, there are no facts supporting this claim of pretext, only Qaiser's own speculation.

In sum, the Court finds that Defendants have proffered a legitimate, nondiscriminatory reason for not hiring Qaiser.

Qaiser did not demonstrate that this reason was pretext for unlawful discrimination.  Thus, the Court will grant Defendants summary judgment on the claim of discrimination relating to the September 2012 failure to hire.

The Court turns now to Qaiser's hostile work environment claim.

C.          Hostile Work Environment

The elements of a hostile work environment claim are well established.  The plaintiff must show that she was subject to conduct that was (1) unwelcomed; (2) based on a protected status; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and that (4) there is some basis for imposing liability on the employer.  *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 190 (4th Cir. 2004).  Defendants argue that the second and third elements are not met in this case.  The Court agrees.

Qaiser's hostile work environment claim is insufficient as a matter of law because the actions complained of were not based on Qaiser's protected status.  As this Court has previously noted, "the type of conduct necessary to state a hostile work environment claim involves racially offensive remarks or other overt racially insulting conduct."  *Dawson v. Rumsfeld*, No. 1:05-cv-1270 (JCC), 2006 WL 325867, at *4 (E.D.

Va. Feb. 8, 2006).  In other words, "the *sine qua non* of a hostile work environment claim is the presence, in the workplace, of racially offensive remarks or other actions that are, in and of themselves, racially insulting."  *Id.*; *Bush v. Hagel*, No. 1:12-cv-1483, 2014 WL 345650, at *9 (E.D. Va. Jan. 30, 2014), *aff'd* 597 F. App'x 178 (4th Cir. 2015) (finding plaintiff failed to state a claim as a matter of law in a case with "no evidence of any racial slurs or insults of any kind being used toward plaintiff, nor was plaintiff in any way physically threatened").  The Fourth Circuit recognized the same in *Honor v. Booz-Allen & Hamilton, Inc.*, when it found that a claim for hostile work environment fails when it is "based on professional frustrations, not personal racial attacks."  383 F.3d at 190-91; *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 282 (4th Cir. 2000).  Qaiser has not alleged, let alone presented evidence of, a single comment, threat, email, or physical intimidation based on her protected statuses.  Accordingly, her hostile work environment claim fails as a matter of law.

The discrete incident involving the firearm scare is not to the contrary.  Although Qaiser alleges that this incident was motivated by prejudice toward Muslims and Pakistanis, she does not allege that a single statement was made to that effect.

33

Additionally, there is no evidence that Piccioni ever made any such comment or that the incident led to any derogatory or discriminatory comment from anyone at the SBA.  Thus, not even this incident, viewed in the light most favorable to Qaiser, can state a claim for a hostile work environment.

Even more to the point, Qaiser's hostile work environment claim fails as a matter of law because she has not shown that the conduct complained of was so severe or pervasive as to alter the conditions of employment and create an abusive atmosphere.  This element creates a high bar, as a "plaintiff can prevail on such a claim only when there is racial harassment 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Hawkins*, 203 F.3d at 281 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  In other words, "Title VII is not intended to serve as a work civility code . . . and does not countenance a federal cause of action for unpleasantness." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  Thus, "complaints premised on nothing more than rude treatment by [coworkers], callous behavior by one's superiors, or a routine difference of opinion and personality conflict with [one's] supervisor are not actionable under Title VII."  *E.E.O.C. v. Sunbelt Rentals, Inc.,* 521 F.3d 306, 316 (4th Cir. 2008); *see*

34

*also Thomas v. Potter*, No. 1:06-cv-377, 2006 WL 2850623, at *5 (E.D. Va. Oct. 3, 2006) (finding plaintiff's claims that he "was criticized for his work performance, received warnings for failing to report to work, and was subject to rude conduct" do not "rise to the level of severe or pervasive harassment").

The allegations within the complaint demonstrate Qaiser's misunderstanding of the hostile work environment cause of action and the insufficiency of her claim.  In relevant part, the complaint alleges that Defendants created a hostile work environment in the following ways:

> [B]y using her good expertise, by asking her to do various tasks because she had been in their employ for many years, and to ask her to train new hires, and dishonestly, say she was not qualified to be promoted or selected for permanent position even though she had worked on the same position for over four years, and more years than those selected or promoted, was kept on the job even after she was apparently not good enough to do it, and never fired until she and others were laid off because the positions were all made permanent.

(Compl. ¶ 31 (errors in original).)  In sum, Qaiser complains that Defendants failed to appreciate her contribution to the Center and unfairly refused to promote her to a permanent position.  These are complaints about the "ordinary tribulations of the workplace," *Faragher*, 524 U.S. at 788, which cannot sustain a claim for a hostile work environment, even when viewed

in the light most favorable to Qaiser.  *See Rattigan v. Gonzales*, 503 F. Supp. 2d. 56, 82 (D.D.C. 2007) ("[I]f an employee is discriminatorily denied ten promotions over a period of time, that pattern of conduct may give rise to ten separate claims under Title VII, but it could not create a hostile work environment claim based on pervasive intimidation, insult and ridicule.").  That conclusion is even more evident when considering Qaiser's testimony that she "got along with everybody" at the Center and desired to work there so much that she pursued several permanent employment opportunities.  (Defs.' Ex. B at 33.)

        As a last argument on this point, Qaiser unpersuasively attempts to bring her claim within the scope of *Boyer-Liberto v. Fountainbleau Corp.*, 786 F.3d 264 (4th Cir. 2015) (en banc).  In *Boyer-Liberto*, the Fourth Circuit recognized that in rare instances a single incident could be sufficient to sustain a hostile work environment claim.  *Id.* at 281.  Qaiser believes that the retraction of her promotion in 2010 is such an instance.  In *Boyer-Liberto*, however, the defendant twice berated the plaintiff by calling her a "dang porch monkey" and said "[I'm] going to get [you]" and "[I'm] going to make [you] sorry," all while being so close that the defendant "sprayed Liberto's face with saliva."  *Id.* at 269.

*Boyer-Liberto* "rested on the acknowledgment that there are certain words with such a deep history of animus that these words have no place in any work environment." *Tomasello v. Fairfax Cty., Va.*, No. 1:15-cv-95, 2016 WL 165708, at *24 (E.D. Va. Jan. 13, 2016).

There is no meaningful similarity between the facts of *Boyer-Liberto* and the circumstances of Qaiser's withdrawn promotion in 2010. Qaiser's employer explained that it withdrew the offer because the SBA determined that the position would not be filled at that time. Even if that comment was untrue, Qaiser does not even allege, let alone produce evidence, that anyone made an overtly or suggestively derogatory comment to her regarding the promotion withdraw. Accordingly, Qaiser's case falls far outside the scope of *Boyer-Liberto*.

The Court also notes that this hostile work environment claim arises from the same discrete actions alleged in Qaiser's adverse employment action claims. To bootstrap discrete actions separated by years into a hostile work environment claim would create an end run around the requirements of proving a disparate treatment or adverse employment action claim. *See Dawson*, 2006 WL 325867, at *4 ("Were this Court to permit a hostile work environment claim premised on such allegations, it would be cognizing an end run

37

around the required elements of a disparate treatment claim."); *Alexander v. City of Greensboro*, No. 1:09-cv-293, 2013 WL 6687237, at *20 (M.D.N.C. Dec. 18, 2013).  The need to avoid blurring the boundaries of distinct causes of action is particularly important where the plaintiff fails to exhaust administrative remedies, as occurred here.  *See Patterson v. Johnson*, 391 F. Supp. 2d 140, 146 (D.D.C. 2005) ("[P]laintiff cannot cure his failure to timely exhaust his complaints about these incidents by sweeping them under the rubric of a hostile work environment claim.")

For the reasons discussed above, the Court will grant Defendants summary judgment with respect to Qaiser's hostile work environment claim.

D.       Harassment

The complaint also contains a count labeled "Harassment." (Compl. ¶ 30.)  In that count, Qaiser alleges the same circumstances that form her hostile work environment claim. Defendants argued that there is no Title VII cause of action for harassment distinct from a hostile work environment claim. (Defs.' Mem. in Supp. 18-19.)  Qaiser's opposition to summary judgment does not attempt to distinguish her harassment and hostile environment claims.  At oral argument on March 17, 2016, Qaiser's counsel said that the "Harassment" and hostile work

environment claims are "basically the same claim."  Qaiser has cited no authority purporting to recognize a harassment claim distinct from a hostile work environment claim, and the Court is not aware of any such authority.  Accordingly, for the reasons described in the hostile work environment section, the Court will grant Defendants summary judgment on this claim.

E.      Proper Defendant

        Defendants also argue that the SBA and Piccioni must be dismissed because they are not proper defendants in a Title VII case.  The Court agrees.

        42 U.S.C. § 2000e-16(c) specifically states that the "head of the department, agency, or unit, as appropriate, shall be the defendant" in a Title VII civil action.  The head of the SBA is the Administrator.  *See Hall v. Small Bus. Admin.*, 695 F.2d 175, 180 (5th Cir. 1983) ("The Administrator of the SBA is the head of that agency.")  Thus, as the Fifth Circuit Court of Appeals has aptly stated, "[t]here is patently no cause of action against the SBA, its regional director, or its district director."  *Id.; see also Williams v. Bolger*, 861 F.2d 267, 1988 WL 105284, at *1 (4th Cir. Sept. 26, 1988) (unpub.) (affirming district court's determination that Postmaster General was only proper defendant in Title VII suit brought against U.S. Postal Service and mid-level managers).  Accordingly, as an alternative

to the foregoing bases for summary judgment, the Court will
dismiss the SBA and Piccioni as improper defendants.

F.        Leave to Amend

        While the present motion was pending, Qaiser filed a
motion for leave to amend her complaint pursuant to Federal Rule
of Civil Procedure 15(a)(2).  [Dkt. 21.]  The only substantive
change Qaiser seeks through this amendment is to add a Virginia
state law claim of "tortious interference with at-will
contractual relationship and business expectancy" against
Piccioni and newly added defendant Terry Hetherington based on
the Court's 28 U.S.C. § 1367 supplemental jurisdiction.  (Pl.'s
Mem. in Supp. of Amend. [Dkt. 22] at 1; Am. Compl. [22-1] ¶¶ 20,
40-49.)  That motion to amend will be denied.

        As described above, Qaiser's federal claims are
subject to summary judgment in favor of Defendants.  Because the
Court has granted summary judgment on the federal claims
creating original jurisdiction, the Court would decline to
exercise supplemental jurisdiction over the state law tort claim
Qaiser seeks to add through amendment.  Accordingly, Qaiser's
amendment would be futile.  *Toomer v. Warden*, No. DKC-13-0614,
2015 WL 412935, at *1 n.2 (D. Md. Jan. 29, 2015) ("As
Plaintiff's federal claim is subject to dismissal, the court
would decline to exercise jurisdiction over his pendant state

40

court claims.  Therefore any amendment to this Complaint to assert these claims would be futile."). *In re XE Servs. Alien Tort Litig.*, 665 F. Supp. 2d 569, 599 (E.D. Va. 2009).  The remaining amendments sought are merely typographical corrections or similar superficial changes that do not affect the Court's basis for granting summary judgment.  Accordingly, the motion to amend will be denied as futile.

### IV.    Conclusion

For the reasons stated above, the Court will grant Defendants' motion for summary judgment.

An appropriate order will issue.

                                    /s/
March 18, 2016                    James C. Cacheris
Alexandria, Virginia       UNITED STATES DISTRICT COURT JUDGE

41